UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RANDALL SCOTT MILLER,

     Petitioner,

v.                                     Case No. 8:19-cv-2914-MSS-AAS

SECRETARY, DEPARTMENT OF
CORRECTIONS,

     Respondent.

_____

## ORDER

Randall Scott Miller petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state-court convictions for attempted second-degree murder and armed false imprisonment. After reviewing the amended petition (Dkt. 16), the response and the appendix containing the relevant state-court record (Dkts. 23, 25), and the reply (Dkt. 30), the Court **DENIES** the amended petition.

## I.    BACKGROUND

On April 16, 2013, Miller shot his ex-girlfriend in an orange grove in Polk County, Florida. (Dkt. 25-2, Ex. 1a, at 455, 459, 461) Miller and the victim, Micki Pickren, had dated for approximately three years before breaking up in August 2012. (Id. at 436, 455) Three days before the shooting, Miller "bragged" to a friend that he had told Pickren's sister that "he was going to shoot [Pickren] and feed her to the alligators." (Id. at 412) On the day of the shooting, Miller arrived at Pickren's house to take her to his grandfather's funeral. (Id. at 456) They got into an argument, but

Pickren agreed to leave the house with Miller. (Id. at 457) The two drove to the cemetery in Miller's pickup truck. (Id. at 457-58) Afterward, they went to a gas station and a "haunted house." (Id. at 458, 599) As they continued to drive around, the two got into another argument. (Id. at 458)

Miller eventually pulled into an orange grove and said he needed to "get out and look for" his "mirror." (Id. at 460) Pickren got out to help, walking around the back of the truck. (Id. at 460-61) She "felt an impact" and fell to the ground. (Id. at 461) Miller stood over her and said, "Now look what you made me do." (Id.) He then shot her in the head twice with a .22 caliber rifle and "hit[ ] [her] with the butt of the gun." (Id. at 461, 602) Miller put her back in the truck and drove off. (Id. at 462, 477) Pickren said, "[P]lease don't let me die, let me out." (Id. at 462) Miller told Pickren he would "ride around with [her] till [she] died." (Id.)

As the truck approached an intersection, Pickren saw a "cop car" in the distance. (Id. at 463) Before reaching the intersection, Miller pulled into a cul-de-sac. (Id.) Pickren got out of the truck, and Miller drove off. (Id.) Pickren flagged down a passing vehicle, saying, "Help me, help me, I've been shot." (Id. at 365) The passenger exited the car and found a police officer. (Id. at 365) Pickren was taken to Lakeland Regional Medical Center. (Id. at 251) There, she received treatment for a gunshot wound on her left cheek, another gunshot wound on the top of her head, and a laceration on the "back of her head." (Id. at 552-53, 555) At the hospital, Pickren told police that Miller had shot her. (Id. at 485)

Meanwhile, Miller fled to Vero Beach, Florida. (<u>Id.</u> at 500-01) He called a friend in town and said he wanted to meet up. (<u>Id.</u> at 501) The friend asked Miller "what he was doing in Vero [Beach]." (<u>Id.</u> at 502) Miller said he "had [done] something bad" and his friend "would probably be hearing about it on the news or reading about it in the papers." (<u>Id.</u>) The friend decided not to see Miller. (<u>Id.</u> at 503) Next, Miller drove to Carrollton, Georgia, to meet up with his uncle, Gary Bullock. (<u>Id.</u> at 612-13) Bullock told Miller "he needed to turn himself in." (<u>Id.</u> at 623) Miller ultimately surrendered to local law enforcement in Carrollton. (<u>Id.</u> at 286-88) Officers found a bullet hole in the "front quarter panel" of Miller's truck; they also found a bloodstain on the "passenger headrest." (<u>Id.</u> at 299, 314-15) The blood matched Pickren's DNA. (<u>Id.</u> at 355)

Miller was charged with attempted first-degree murder and armed kidnapping. (<u>Id.</u>, Ex. 1, at 16) The case went to trial. (<u>Id.</u>, Ex. 1a) Miller testified in his defense, claiming that the shooting was an "accident." (<u>Id.</u> at 614) According to him, Pickren grabbed the rifle, threatened to kill herself, and was accidentally shot as the two "struggle[d]" for the gun. (<u>Id.</u> at 603-04.) A jury found Miller guilty of the lesser-included offenses of attempted second-degree murder and armed false imprisonment. (<u>Id.</u> at 718) He received a total sentence of life imprisonment. (<u>Id.</u>, Ex. 1, at 361-62) The appellate court affirmed the convictions without a written opinion. (<u>Id.</u>, Ex. 4) Miller unsuccessfully moved for postconviction relief under Florida Rule of Criminal Procedure 3.850 and Florida Rule of Appellate Procedure 9.141(d). (<u>Id.</u>, Exs. 7-11, 14a-14d; Dkt. 25-3, Exs. 27, 30, 33) This federal habeas petition followed. (Dkt. 16)

## II.    LEGAL STANDARDS

### A.    AEDPA

Because Miller filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), AEDPA governs his claims. Lindh v. Murphy, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the

prisoner's case." Id. at 413. Clearly established federal law refers to the holding of an opinion by the United States Supreme Court at the time of the relevant state-court decision. Id. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 694 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

### B.    Ineffective Assistance of Counsel

Miller asserts ineffective assistance of counsel—a difficult claim to sustain. Strickland v. Washington, 466 U.S. 668, 687 (1984), explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. "[A] court deciding an

actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. at 694.

Strickland cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 690-91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992).

Because the standards under Strickland and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" Nance v. Warden, Ga. Diag. Prison, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

The appellate court affirmed Miller's convictions, as well the denial of postconviction relief, without discussion. (Dkt. 25-2, Ex. 4; Dkt. 25-3, Ex. 27) A

federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 584 U.S. 122, 125 (2018). Because the postconviction court provided reasons for denying Miller's claims in written orders, (Dkt. 25-2, Ex. 11, at 111-13, 316-17, 341-44), this Court evaluates those reasons under § 2254(d).

### C.    Exhaustion and Procedural Default

A petitioner must exhaust the remedies available in state court before a federal court can grant habeas relief. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Picard v. Connor, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A federal court may stay—or dismiss without prejudice—a habeas case to allow a petitioner to return to state court to exhaust a claim. Rhines v. Weber, 544 U.S. 269 (2005); Rose v. Lundy, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court denies the claim as procedurally barred. Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir. 1998) (citing Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)).

Also, a petitioner's failure to comply with a state procedural rule governing

the proper presentation of a claim bars review of that claim on federal habeas. Coleman, 501 U.S. at 729. "[A] state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the state procedural ruling rests upon [an] 'independent and adequate' state ground." Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). A state court's procedural ruling rests on an independent and adequate state ground if (1) the last state court rendering a judgment in the case clearly and expressly relies on a state procedural rule to resolve the federal claim without reaching the merits of the claim, (2) the state court's decision rests solidly on state-law grounds and is not intertwined with an interpretation of federal law, and (3) the state procedural rule is not applied in an "arbitrary or unprecedented fashion" or in a "manifestly unfair" manner. Id. (citing Card v. Dugger, 911 F.2d 1494, 1516-17 (11th Cir. 1990)).

To excuse a procedural bar on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. Maples v. Thomas, 565 U.S. 266, 280 (2012); House v. Bell, 547 U.S. 518, 536-37 (2006).

## III.    DISCUSSION

### A.    Ground One and Ground Four, Sub-Claim A—Alleged Suppression of Exculpatory Evidence

Miller argues that the prosecution violated Brady v. Maryland, 373 U.S. 83 (1963), by suppressing evidence "favorable to the defense." (Dkt. 16 at 5) First, the prosecution allegedly failed to "preserve" exculpatory text messages on Miller's

8

cellphone. (Id.; Dkt. 25-2, Ex. 11, at 80) According to Miller, the messages contained "suicidal statements" from the victim, Micki Pickren, on the day of the shooting. (Dkt. 16 at 5; Dkt. 25-2, Ex. 11, at 80) Although the messages were on Miller's cellphone when he gave it to law enforcement, they were allegedly "gone" and "no longer retrievable" by the time of trial. (Dkt. 25-2, Ex. 11, at 80-81) Second, he asserts the prosecution failed to perform a gunshot residue test on "swabs that were taken from" Pickren. (Id. at 82; Dkt. 16 at 5) Miller alleges that the test would have "show[n] that the firearm was in [Pickren's] hands at the time of discharge." (Dkt. 25-2, Ex. 11, at 82) Separately, Miller argues that trial counsel was ineffective for failing to "move for dismissal" based on the prosecution's alleged "suppression" of exculpatory evidence. (Dkt. 16 at 10)

The postconviction court rejected these claims, finding that Miller failed to prove a Brady "violation on the part of the State" and that counsel had no "proper grounds for dismissal." (Dkt. 25-2, Ex. 11, at 112) This ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

"To prevail on a Brady claim, the defendant must establish: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the defendant incurred prejudice." Wright v. Sec'y, Fla. Dep't of Corr., 761 F.3d 1256, 1278 (11th Cir. 2014). Relatedly, the State has a duty to preserve "evidence that might be expected to play a significant role in the suspect's

defense." California v. Trombetta, 467 U.S. 479, 488 (1984). "Although it hardly bears mention, an implicit prerequisite of any Brady claim is that favorable, material evidence actually exists." United States v. Alverio-Melendez, 640 F.3d 412, 424 (1st Cir. 2011); see also Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 846 (11th Cir. 2011) (noting that "Petitioner's Brady claim hangs on the existence of exculpatory evidence"); United States v. Fritzsching, No. 2:15-cr-715, 2017 WL 389088, at *7 (D. Utah Jan. 26, 2017) (no constitutional violation from alleged destruction of evidence that "never existed in the first place").

A reasonable jurist could conclude that Miller's Brady claim lacked merit. According to Miller, law enforcement swabbed Pickren's hands but "never conducted [a] test" for gunshot residue. (Dkt. 25-2, Ex. 11, at 82) This allegation does not establish a Brady violation. The "police do not have a constitutional duty to perform any particular tests" on evidence recovered during an investigation. Arizona v. Youngblood, 488 U.S. 51, 59 (1988); see also Alverio-Melendez, 640 F.3d at 424 ("[B]ecause no fingerprint analysis report existed, the government did not commit a Brady violation in failing to turn over such a report."); Armijo v. Tapia, 288 F. App'x 530, 533 (10th Cir. 2008) (rejecting petitioner's "incorrect assumption that the state had an obligation under the Constitution to provide DNA analysis" of evidence); United States v. Marrero, 904 F.2d 251, 261 (5th Cir. 1990) (the constitution "does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case"). Regardless, Miller presents no evidence that a gunshot residue test would have yielded a positive result. Instead, he

simply speculates that the test would have "show[n] that the firearm was in [Pickren's] hands at the time of discharge." (Dkt. 25-2, Ex. 11, at 82) Mere speculation is insufficient to establish a Brady violation. See United States v. Naranjo, 634 F.3d 1198, 1212 (11th Cir. 2011).

A reasonable jurist could also conclude that Miller did not receive "suicidal" text messages from Pickren on the day of the shooting. (Dkt. 16 at 5) In support of this allegation, Miller submitted an affidavit from Gary Bullock, his uncle. (Dkt. 25-2, Ex. 11, at 69) Bullock stated that Miller's cellphone contained "texts" from Pickren in which she "ma[de] suicidal statements." (Id.) But two pieces of evidence undercut this assertion. At trial, Miller testified about text messages he received from Pickren on the day of the shooting. (Id., Ex. 1a, at 593) He said the texts concerned "problems with . . . her son and her daughter that she lived with, that they were kicking her out of her house." (Id.) Miller also noted that Pickren had "texted . . . saying she'd heard about my grandfather dying and . . . she was sorry about that." (Id.) But Miller never testified that Pickren was suicidal in any of her texts. (Id.) That omission is notable because Miller's defense was that Pickren grabbed the rifle, threatened to kill herself, and was accidentally shot as the two "struggle[d]" for the gun. (Id. at 603-04.)

Moreover, before opening statements, the court took a three-and-a-half-hour recess to allow a defense expert to conduct a "forensic analysis" of the cellphone. (Id. at 203-04) The goal was to "extract any text messages" between Miller and Pickren. (Id. at 199) After the recess, defense counsel explained that he had "no intention of calling" the expert, who found only "some indications of some telephone calls." (Id.

11

at 204) Counsel did not claim—and nothing in the record suggests—that the expert uncovered any evidence that texts had been deleted from the cellphone. (Id.)

On this record, "some fairminded jurists could agree" that no Brady violation occurred because the cellphone did not contain suicidal text messages from Pickren. Loggins v. Thomas, 654 F.3d 1204, 1220 (11th Cir. 2011) (noting that "if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied"). Likewise, because a fairminded jurist could find no Brady violation, the postconviction court reasonably concluded that counsel was not obligated to seek dismissal on that basis. See Freeman v. Atty. Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

### B.    Ground Two, Sub-Claim A—Failure to Adequately Impeach Victim

Miller argues that trial counsel provided ineffective assistance by failing to impeach the victim, Micki Pickren, with "several [prior] inconsistent statements." (Dkt. 16 at 7) According to Miller, Pickren testified inconsistently about (1) whether she was "hit with the butt of the gun," (2) whether she "[t]ouched the gun" on the day of the shooting, and (3) whether Miller committed other "acts of physical violence" against her. (Dkt. 25-2, Ex. 11, at 85-87) Miller argues that counsel's "failure to impeach" Pickren on these matters "prevent[ed] the jury from seeing [her] unreliability and inconsistency." (Id. at 86)

12

The postconviction court reasonably rejected this claim.[1] (Id. at 317) Pickren did not testify inconsistently about whether she was "hit with the butt of the gun." (Id. at 85) At trial, she stated that Miller shot her twice and then "hit[ ] [her] with the butt of the gun." (Id., Ex. 1a, at 461) She offered the same account at her deposition, claiming that Miller "got over . . . [her] and shot [her] two more times, and then hit [her] with the butt of the gun." (Dkt. 25-3, Ex. 38, at 28) To be sure, Pickren also said at her deposition that she could not "recall" being "pistol-whipped." (Id. at 39) But the firearm in question was a .22 caliber rifle, not a pistol. (Dkt. 25-2, Ex. 1a, at 602) Regardless, there is no basis to conclude that highlighting this minor discrepancy would have made any difference at trial. See Bradley v. Sec'y, Fla. Dep't of Corr., No. 17-12926-K, 2018 WL 3238836, at *9 (11th Cir. Apr. 2, 2018) ("The fact that trial counsel may not have highlighted every inconsistent minor detail in the victim's testimony did not [lead to] a reasonable probability of changing the trial's outcome.").[2]

Nor was counsel deficient for failing to cross-examine Pickren about whether she "[t]ouched the gun" on the day of the shooting. (Dkt. 25-2, Ex. 11, at 85) At trial, Pickren was asked whether she "had possession [of] or . . . handled a gun that day." (Id., Ex. 1a, at 476) She said, "No, sir." (Id.) In her deposition, Pickren was asked whether she and Miller "ever ha[d] a fight or struggle over" the gun. (Dkt. 25-3, Ex.

---

[1] Respondent argues that Ground Two, Sub-Claim A is procedurally defaulted, but the Court need not reach that issue because the claim fails on the merits. See Dallas v. Warden, 964 F.3d 1285, 1307 (11th Cir. 2020) ("[A] federal court may skip over the procedural default analysis if a claim would fail on the merits in any event.").

[2] The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority. See 11th Cir. R. 36-2." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

38, at 30) She responded, "No, sir. Not that I know of." (Id.) These two statements are
not inconsistent because the "prior statement [does not] directly contradict, [nor is it]
materially different from, the testimony offered at trial." Woods v. State, 92 So. 3d
890, 892 (Fla. 4th DCA 2012).

Finally, counsel did not provide ineffective assistance by failing to point out that
Pickren had previously accused Miller of "other . . . acts of physical violence." (Dkt.
25-2, Ex. 11, at 86) Pickren allegedly made these accusations to "the media," but
Miller provides no additional information about what Pickren said. (Id.) Instead, he
asserts that the accusations were "previously never mentioned and never mentioned
thereafter," that they were "the opposite of [Pickren's] deposition testimony," and that
they were somehow "refuted" by the medical examiner. (Id.) According to Miller,
counsel should have brought out the accusations to "show [Pickren's] unreliability and
inconsistency." (Id.)

Miller fails to overcome "[the] strong presumption that counsel's performance
was reasonable and that counsel made all significant decisions in the exercise of
reasonable professional judgment." Chandler v. United States, 218 F.3d 1305, 1314
(11th Cir. 2000). To rebut the presumption, Miller must show that "no competent
counsel would have taken the action that his counsel did take." Id. at 1315. He cannot
do so. A competent attorney could have concluded that Miller's defense would suffer
if the jury learned that Pickren had previously accused him of "other . . . acts of
physical violence." (Dkt. 25-2, Ex. 11, at 86) Indeed, defense counsel successfully
moved *in limine* to exclude any reference to "prior acts of . . . domestic violence

between [Pickren] and . . . Miller." (Id., Ex. 1a, at 191-94) Thus, the postconviction court reasonably concluded that counsel was not deficient for failing to bring out other instances of domestic violence.[3]

### C.    Ground Two, Sub-Claim B—Failure to Argue that Law Enforcement Coerced Victim

Miller faults trial counsel for failing to argue that detectives "coerc[ed]" Pickren when they interviewed her at the hospital. (Dkt. 16 at 7; Dkt. 25-2, Ex. 11, at 105) During the interview, Pickren described the shooting and identified Miller as the perpetrator. (Dkt. 25-3, Ex. 36, at 1-10) To support his allegation of coercion, Miller points to the following exchange at the end of the interview:

> Q. Yeah, so without a doubt, SCOTT[.[4]]
>
> A. Yeah.
>
> Q. [Y]our boyfriend[.]
>
> A. Yeah.
>
> Q. That you just broke up with[.]
>
> A. Yeah.
>
> Q. [H]e's the one that did this?
>
> A. Uhm, yes sir.
>
> Q. Yes?

---

[3] According to Miller, Pickren "clearly indicat[ed] [in her deposition that] no physical violence [was] done to her by [him]." (Dkt. 25-2, Ex. 11, at 85) In fact, Pickren testified that, on the day of the shooting, Miller did not use any physical force against her *until they reached the orange grove.* (Dkt. 25-3, Ex. 38, at 24-25) Nothing about this statement contradicts what Pickren said at trial.

[4] At trial, Miller testified that he had "been called Scott ever since [he] was a baby." (Dkt. 25-2, Ex. 1a, at 584)

A. Uh.

Q. You have to say it. I'm sorry?

A. Yes sir.

(Id. at 9) According to Miller, this exchange shows that law enforcement "coerc[ed]"
Pickren by "telling her what she <u>has</u> to say." (Dkt. 25-2, Ex. 11, at 105)

The postconviction court rejected Miller's claim of ineffective assistance,
finding that any "attempt[ ] to argue that [Pickren's] initial interview was coerced
would not have added to counsel's effectiveness in presenting his defense." (<u>Id.</u> at 344)
According to the court, the interview "transcript contain[ed] no indication that
[Pickren] was coerced into naming [Miller] as her assailant." (<u>Id.</u> at 343) The court
noted that, in the relevant portion of the interview, the detective was simply
"attempting to confirm that [Pickren was] naming [Miller] as her assailant." (<u>Id.</u>) The
court also pointed out that "the interview was conducted at the hospital with [Pickren]
shortly after having been shot in the face and head." (<u>Id.</u>)

The rejection of this claim was reasonable. To prevail on his assertion of
ineffective assistance, Miller must "show that no reasonable jurist could find that his
counsel's performance fell within the wide range of reasonable professional conduct."
<u>Franks v. GDCP Warden</u>, 975 F.3d 1165, 1176 (11th Cir. 2020). Miller cannot meet
his burden. As the postconviction court explained, nothing in the interview transcript
suggests that Pickren "was coerced into naming [Miller] as her assailant." (Dkt. 25-2,
Ex. 11, at 343) "Sufficiently coercive conduct normally involves subjecting [someone]
to an exhaustingly long [interview], the application of physical force or the threat to

do so, or the making of a promise that induces a [statement]." <u>United States v. Jones</u>, 32 F.3d 1512, 1517 (11th Cir. 1994). Nothing of the sort took place during Pickren's interview. Instead, the detective merely sought to ensure that Pickren verbalized her identification of Miller as the perpetrator. (Dkt. 25-3, Ex. 36, at 9) Moreover, before the cited portion of the interview, Pickren was clearly talking about Miller's conduct on the day of the shooting. For example, the detective asked, "What were you and SCOTT arguing about before this happened?" (<u>Id.</u> at 7) Pickren replied, "We were just arguing about everything." (<u>Id.</u>) Thus, the postconviction court reasonably concluded that counsel was not deficient for failing to raise Miller's meritless coercion argument.

### D.    Ground Three—Failure to Inform Medical Examiner of Removal of Gunshot Residue

According to Miller, trial counsel should have "inform[ed]" the state medical examiner that "gunshot residue . . . was removed from [Pickren's] cheek when [he] gave first aid with a t-shirt." (Dkt. 16 at 8) At trial, the medical examiner testified that Pickren's wounds did not "appear to be self-inflicted." (Dkt. 25-2, Ex. 1a, at 548-49) He explained that the wounds had "none of the characteristics of close-range firing"— specifically, they lacked "the soot, the powder that we would expect to see from somebody who's got a gunshot wound that's close to them." (<u>Id.</u> at 550) According to the medical examiner, such residue is typically absent from a wound if the "muzzle" is more than "two feet" away. (<u>Id.</u> at 549) Miller contends that counsel should have "recall[ed]" the medical examiner and explained that he removed "powder residue" from Pickren's cheek by "applying first aid" with a t-shirt. (<u>Id.</u>, Ex. 11, at 88) Had the

medical examiner known this, he allegedly would have disavowed his "erroneous finding that the muzzle of the rifle was [at least] two feet away when discharge occurred." (Id. at 88-89)

The postconviction court granted an evidentiary hearing on this claim. (Id. at 317) Miller was appointed counsel, but he ultimately decided to proceed *pro se*. (Id. at 317, 322-23) After firing his lawyer, he moved to subpoena the medical examiner to appear at the hearing. (Id., Ex. 12) That request was granted. (Id., Ex. 13) Before the hearing, however, Miller "waive[d] the appearance of" the medical examiner, explaining that he wished to avoid "more delays in [the] proceedings." (Id., Ex. 11, at 715) Thus, the medical examiner did not testify at the hearing. (Id. at 444) The only witnesses were Miller and his mother. (Id.)

After the hearing, the postconviction court rejected Miller's claim, finding no basis to conclude that "trial counsel was ineffective for failing to recall" the medical examiner. (Id. at 343) The court noted that the medical examiner "was not called by [Miller] at the evidentiary hearing and no noteworthy new evidence was presented on [Miller's] claims." (Id.) In addition, the court found it unlikely that gunpowder "embedded" in a wound could "have been . . . wiped off by [a] shirt." (Id.)

This ruling was reasonable. Miller alleges that he removed gunpowder residue from Pickren by wiping her cheek with a t-shirt, and that the medical examiner would have changed his testimony had he known of this alleged fact. (Dkt. 16 at 8; Dkt. 25-2, Ex. 11, at 88-89) But Miller presents no evidence that gunpowder residue can be removed from a wound in the manner he suggests. Nor is there any evidence that the

medical examiner would have revised his estimate of the distance between the muzzle and the wound if he had been confronted with Miller's allegations. Notably, Miller had the opportunity to call the medical examiner at the evidentiary hearing, but he chose not to do so. (Dkt. 25-2, Ex. 11, at 715) With no evidence to support his claim, Miller can only speculate that the medical examiner would have offered favorable testimony if he had been recalled at trial. Such speculation "is insufficient to carry the burden of a habeas corpus petitioner." Brownlee v. Haley, 306 F.3d 1043, 1060 (11th Cir. 2002); see also Johnson v. Alabama, 256 F.3d 1156, 1187 (11th Cir. 2001) ("[Petitioner] offers only speculation that the missing witnesses would have been helpful. This kind of speculation is insufficient to carry the burden of a habeas corpus petitioner.").

### E.    Ground Four, Sub-Claim B—Failure to Object to Prosecutorial Misconduct

Miller argues that trial counsel provided ineffective assistance by failing to "object to multiple instances of . . . improper statements [in] closing arguments." (Dkt. 16 at 10) The postconviction court correctly rejected this claim. (Dkt. 25-2, Ex. 11, at 113) "To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006).

First, Miller alleges that the prosecutor falsely accused him of throwing away the rifle. (Dkt. 25-2, Ex. 11, at 89) Specifically, the prosecutor said, "You have officers on scene with metal detectors. . . . They don't find a two-foot-long rifle. Why? Because [Miller] collected it. He had the time. Right? He picked up all of those things, threw that gun away." (Id., Ex. 1a, at 691) Counsel had no basis to object to these remarks. "The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." Silvia v. State, 60 So. 3d 959, 977 (Fla. 2011). As the prosecutor correctly noted, law enforcement did not find a rifle during its search of the orange grove. (Dkt. 25-3, Ex. 1a, at 520) Moreover, Miller had an obvious incentive to get rid of the weapon he used to shoot his ex-girlfriend. Thus, a "fair inference" is that he disposed of the rifle after leaving the orange grove. McKenzie v. State, 830 So. 2d 234, 238 (Fla. 4th DCA 2002); see also United States v. Johns, 734 F.2d 657, 663 (11th Cir. 1984) (prosecutor may draw "inferences fairly suggested by the evidence or by matters of common knowledge outside the evidence").

Second, Miller accuses the prosecutor of "describing a fictitious bullet wound to the top of [Pickren's] head." (Dkt. 25-2, Ex. 11, at 90) The prosecutor said that Miller "went to that orange grove [and] took that first shot at [Pickren's] face. . . . He could have stopped, but he didn't. . . . [He] hit her in the head and took that second shot." (Id., Ex. 1a, at 660-61) Counsel had no basis to object to these remarks, which were consistent with the medical examiner's testimony. Specifically, the medical examiner opined that Pickren suffered a gunshot wound on her left cheek and a

laceration (or "slit-like tear") on the "back of her head." (Id. at 552-53) He also described "another wound on the top . . . left side of [Pickren's] head." (Id. at 554-55) This wound was "consistent with a gunshot wound." (Id. at 555) Thus, as the postconviction court held, the "record refutes [Miller's] claim" that the prosecutor misrepresented Pickren's injuries. (Id., Ex. 11, at 113)

Third, Miller faults the prosecutor for pointing out that he refused to turn himself in at the location proposed by law enforcement, instead "suggest[ing] another place where he want[ed] to turn himself in." (Id. at 91; id., Ex. 1a, at 690) Miller peacefully surrendered to law enforcement at the second location—a "shopping center behind [a] Publix grocery store."[5] (Id., Ex. 1a, at 284-87) According to Miller, the prosecutor's reference to the second location rested on "false" "hearsay" testimony from one of the officers involved in the surrender. (Id., Ex. 11, at 91) Even assuming the reference was improper, Miller cannot show prejudice—that is, "a reasonable probability . . . that, but for the remark[ ], the outcome of the trial would have been different." Eckhardt, 466 F.3d at 947. The comment was "isolated" and concerned a collateral issue—Miller's desire to turn himself in at a shopping center instead of the location proposed by law enforcement. United States v. Lopez, 590 F.3d 1238, 1256 (11th Cir. 2009). Moreover, "other evidence existed, including witness testimony and [physical evidence], supporting [Miller's] convictions apart from the [prosecutor's] comment." United States v. Clark, 693 F. App'x 804, 808 (11th Cir. 2017). Because

---

[5] The record does not disclose the initial location proposed by law enforcement.

no prejudice resulted from the challenged remark, counsel was not deficient for failing to object.

Fourth, Miller complains that the prosecutor "suggest[ed] to the jury that [he] manufactured testimony." (Dkt. 25-2, Ex. 11, at 92) In particular, the prosecutor said, "[Miller] sat through this entire trial, listened to all of the evidence that came out. No other witness had that capability. He heard all of that evidence and then took the stand. You can consider that." (Id., Ex. 1a, at 687) These remarks were proper. Indeed, the Supreme Court has upheld the constitutionality of substantially similar comments. Portuondo v. Agard, 529 U.S. 61, 65-74 (2000). As the Court explained, "[a]llowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate—and indeed, given the inability to sequester the defendant, sometimes essential—to the central function of the trial, which is to discover the truth." Id. at 73. Thus, counsel was not obligated to raise Miller's meritless objection.[6]

### F.    Ground Five—Admission of Uncharged Misconduct

Miller argues that the prosecution violated his constitutional rights by eliciting testimony about uncharged misconduct. (Dkt. 16 at 16) The testimony came from Pickren's daughter, Amanda Sullivan. (Dkt. 25-2, Ex. 1a, at 429-30) She claimed that,

---

[6] Miller separately contends that appellate counsel was ineffective for failing to raise these instances of alleged prosecutorial misconduct on direct appeal. (Dkt. 16 at 17; Dkt. 25-2, Ex. 7, at 10-13) For the reasons explained above, Miller's claims of prosecutorial misconduct lack merit. Therefore, counsel was not obligated to raise them on appeal. See United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) ("Appellate counsel is not ineffective for failing to raise claims reasonably considered to be without merit.").

on the morning of the shooting, Miller walked into Pickren's house and "flipped the chair over on [Sullivan], flipped [Sullivan] and the chair over." (Id. at 431) Defense counsel immediately objected and moved for a mistrial. (Id.) The court declined to order a mistrial but ruled that "there can't be any further testimony related to any bad acts that involve this witness."[7] (Id. at 432, 448) According to Miller, Sullivan's testimony was improper because it "only . . . show[ed] bad character and [had] no probative value." (Dkt. 16 at 16)

This claim fails because the challenged testimony did not cause "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Petitioners "are not entitled to habeas relief based on trial error unless they can establish that [the error] resulted in actual prejudice." Id. "To show prejudice under Brecht, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1114 (11th Cir. 2012). An error "is likely to be harmless under the Brecht standard where there is significant corroborating evidence or where other evidence of guilt is overwhelming." Mansfield v. Sec'y, Dep't of Corr., 679 F.3d 1301, 1313 (11th Cir. 2012). "The standard for granting habeas relief under Brecht is extremely demanding." Al-Amin v. Warden Ga. Dep't of Corr., 932 F.3d 1291, 1303 (11th Cir. 2019).

---

[7] The trial court did not instruct the jury to disregard Sullivan's testimony. Although defense counsel moved for a mistrial, counsel did not seek a limiting instruction. (Dkt. 25-2, Ex. 1a, at 431, 444-45) Even so, Miller cannot show actual prejudicial for this single statement such that the decision not to seek a limiting instruction warrants relief on this petition..

Miller cannot show "more than a reasonable possibility that [Sullivan's testimony] contributed to the conviction." Trepal, 684 F.3d at 1114. Sullivan claimed that Miller "flipped [a] chair over on [her]" several hours before the shooting. (Dkt. 25-2, Ex. 1a, at 431) This "testimony was brief, isolated, and never repeated or commented upon in the State's closing argument." Ayalavillamizar v. State, 134 So. 3d 492, 497 (Fla. 4th DCA 2014). Moreover, Sullivan did not accuse Miller of committing any acts of violence against Pickren, the victim in the case. (Dkt. 25-2, Ex. 1a, at 429-38) Finally, "the evidence of [Miller's] guilt was strong." Hull v. Sec'y, Fla. Dep't of Corr., 572 F. App'x 697, 702 (11th Cir. 2014). Pickren testified that Miller shot her in the head, "hit[ ] [her] with the butt of the gun," placed her in his truck, and then told her he would "ride around with [her] till [she] died." (Dkt. 25-2, Ex. 1a, at 461-62) Miller did not deny his presence at the scene of the shooting. Instead, he claimed that the gun accidentally discharged as he tried to take it away from Pickren. (Id. at 603-04) But the medical examiner testified that Pickren's wounds had "none of the characteristics of close-range firing"—that is, "the powder that we would expect to see from somebody who's got a gunshot wound that's close to them." (Id. at 550) For all these reasons, Miller cannot show that Sullivan's brief, isolated remark caused "actual prejudice." Brecht, 507 U.S. at 637.

### G.    Ground Six, Sub-Claim A—Failure to Raise Sufficiency Challenge on Direct Appeal

According to Miller, appellate counsel should have argued on direct appeal that the evidence was insufficient to support his convictions for attempted second-degree

murder and armed false imprisonment. (Dkt. 16 at 17; Dkt. 25-2, Ex. 7, at 7-9) First, Miller argues that the "evidence failed to show [his] acts were the product of ill will, spite, or evil intent," as is required to prove attempted second-degree murder. (Dkt. 25-2, Ex. 7, at 8) Second, Miller contends that his conviction for armed false imprisonment was unlawful because there was "no evidence" that he carried a firearm while committing the offense. (Id. at 7) In Miller's view, appellate counsel was "ineffective for not raising [these] grounds of insufficiency of evidence."[8] (Dkt. 16 at 17)

The appellate court rejected this claim in an unexplained decision. (Dkt. 25-2, Ex. 8) "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. Miller cannot meet his burden because his proposed sufficiency challenge lacks merit.

The Due Process Clause requires the State to prove beyond a reasonable doubt each element of the charged offense. Jackson v. Virginia, 443 U.S. 307, 316 (1979). The governing question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. "When the record reflects facts that support conflicting inferences, there is a presumption that the jury resolved those conflicts in favor of the prosecution and against the defendant." Preston

---

[8] Trial counsel unsuccessfully moved for a judgment of acquittal on both counts. (Dkt. 25-2, Ex. 1a, at 574-77, 631-32)

v. Sec'y, Fla. Dep't of Corr., 785 F.3d 449, 463 (11th Cir. 2015). Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 565 U.S. 1, 2 (2011).

A rational jury could conclude that Miller had the requisite mental state for attempted second-degree murder. As relevant here, the State had to show that Miller committed an "act [that] was imminently dangerous to another and [that] demonstrated a depraved mind without regard for human life." Coissy v. State, 957 So.2d 53, 55 (Fla. 4th DCA 2007). "[A]n act is imminently dangerous to another and evinces a 'depraved mind' if it is an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another; and (2) is done from ill will, hatred, spite[,] or an evil intent; and (3) is of such a nature that the act itself indicates an indifference to human life." Antoine v. State, 138 So. 3d 1064, 1073 (Fla. 4th DCA 2014).

The prosecution presented sufficient evidence that Miller "acted with a depraved mind." Perez v. State, 187 So. 3d 1279, 1282 (Fla. 1st DCA 2016). Pickren testified that Miller shot her in the head two times. (Dkt. 25-2, Ex. 1a, at 461-62) "[P]ointing a loaded gun at the head of the victim and then firing has frequently been held to be an act imminently dangerous to another and evincing a depraved mind regardless of human life." Jacobson v. State, 248 So. 3d 286, 288 (Fla. 1st DCA 2018); see also Holmes v. State, 278 So. 3d 301, 304-05 (Fla. 1st DCA 2019) (holding that "pull[ing] out a loaded pistol and point[ing] it at the victim's head" is "alone . . .

competent evidence that [defendant] possessed the requisite intent to commit second-degree murder"). Miller's "actions after the shooting also reflect the requisite intent to support [an attempted] second-degree murder conviction." Holmes, 278 So. 3d at 305. After he shot Pickren, Miller "did not call 911," nor did he "drive to a hospital." Id. Instead, he placed Pickren in his pickup truck and told her he would "ride around with [her] till [she] died." (Dkt. 25-2, Ex. 1a, at 462) Pickren managed to escape only because Miller pulled into a cul-de-sac after seeing a police vehicle. (Id. at 463) Thus, "[v]iewed in a light most favorable to the State, the evidence was sufficient to allow the jury to determine [that Miller] possessed the ill will, hatred, spite, or evil intent necessary for [an attempted] second-degree murder conviction." Holmes, 278 So. 3d at 305.

A rational jury could also find that Miller carried a firearm when he falsely imprisoned Pickren. "To establish the crime of false imprisonment, the State is required to prove two elements beyond a reasonable doubt: (1) the defendant forcibly, secretly, or by threat confined, abducted, imprisoned, or restrained the victim against his or her will; and (2) the defendant had no lawful authority to do so." Seavey v. State, 57 So. 3d 978, 980 (Fla. 5th DCA 2011). False imprisonment is "typically charged as [a] third-degree felon[y]." Juarez v. State, 65 So. 3d 110, 111 (Fla. 4th DCA 2011). But it is "reclassified as a second-degree felony when during the commission of [the offense] the defendant carries . . . any weapon or firearm." Id. "'[C]arry' is defined . . . as either actual physical possession of a firearm or having the firearm readily available." State v. Joy, 221 So. 3d 1281, 1283 (Fla. 5th DCA 2017).

Miller falsely imprisoned Pickren after the shooting when he put her in his truck, drove off, and responded to her request to "let me out" by saying he would "ride around with [her] till [she] died." (Dkt. 25-2, Ex. 1a, at 462) A rational jury could find that Miller had a "firearm readily available" during the false imprisonment. <u>Joy</u>, 221 So. 3d at 1283. As noted above, the shooting took place in an orange grove, and law enforcement did not find any firearms in that location. (Dkt. 25-3, Ex. 1a, at 520) Viewed in the light most favorable to the prosecution, this evidence would permit a reasonable inference that Miller took the rifle with him when he drove away from the orange grove. <u>See</u> <u>Preston</u>, 785 F.3d at 463 ("When the record reflects facts that support conflicting inferences, there is a presumption that the jury resolved those conflicts in favor of the prosecution and against the defendant.").

In sum, appellate counsel was not deficient for failing to raise Miller's meritless sufficiency challenge. <u>See</u> <u>Freeman</u>, 536 F.3d at 1233 (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

### H.    Ground Six, Sub-Claim B—Failure to Challenge Jury Instruction on Attempted Second-Degree Murder

Miller faults appellate counsel for failing to argue that the jury should not have received an instruction on the lesser-included offense of attempted second-degree murder. (Dkt. 16 at 17; Dkt. 25-2, Ex. 7, at 9) According to Miller, the lesser-included instruction was unlawful because the information did not allege that he acted with a "depraved mind," as is required for attempted second-degree murder. (Dkt. 25-2, Ex. 7, at 9) Instead, the information alleged only the elements of attempted first-degree

murder. (Id., Ex. 1, at 16) Miller says that counsel "showed deficient performance by not raising [the] jury instruction issue[ ]." (Id., Ex. 7, at 10)

Because the appellate court rejected this claim without explanation, (id., Ex. 8), Miller must show that there was "no reasonable basis" to deny relief. Richter, 562 U.S. at 98. He cannot do so.

"Lesser-included offenses fall within two categories: (1) category one necessary lesser-included offenses; and (2) category two permissive lesser-included offenses." Daniel v. State, 137 So. 3d 1181, 1183 (Fla. 3d DCA 2014). "Category one lesser offenses are necessarily included in the offense charged and only require proof to support a conviction for the lesser-included offense. In contrast, category two lesser-included offenses require, in addition to sufficient proof to support a conviction of the lesser-included offense, that the accusatory pleading allege the necessary elements of the lesser-included offense." V.C. v. State, 63 So. 3d 831, 833-34 (Fla. 3d DCA 2011). Attempted second-degree murder is a category one, necessary lesser-included offense of attempted first-degree murder. See Lathan v. State, 270 So. 3d 1262, 1265 (Fla. 5th DCA 2019) (noting that "[f]or the charged crime of attempted first-degree murder, . . . there are four category one, necessarily lesser-included offenses," including "attempted second-degree murder"). As a result, the prosecution was not required to allege the elements of attempted second-degree murder in the information. Moreover, as explained above, Miller fails to show that the prosecution lacked "proof to support a conviction for [attempted second-degree murder]." V.C., 63 So. 3d at 833. Thus, counsel was not deficient for failing to raise Miller's meritless challenge to the lesser-

included instruction. See Tramel v. Sec'y, Fla. Dep't of Corr., No. 3:19-cv-1071-MMH-MCR, 2022 WL 2818111, at *20 (M.D. Fla. July 19, 2022) (although information "did not allege [petitioner] acted with a depraved mind," counsel had no basis to object to instruction on "necessarily lesser-included offense" of attempted second-degree murder).

## I.    Ground Seven—Failure to Argue on Direct Appeal That Trial Counsel Was Ineffective

According to Miller, appellate counsel should have argued on direct appeal that trial counsel was "ineffective[ ] on the face of [the] record." (Dkt. 16 at 18) Miller cites a portion of the closing argument in which trial counsel described Miller's conversation with his friend in Vero Beach and then made the following remark: "So, again, that doesn't create reasonable doubt."[9] (Dkt. 25-2, Ex. 1a, at 676-77) Miller also complains that trial counsel said during closing, "[Pickren] got shot one time in the head." (Id. at 677)

Respondent correctly contends that this claim is procedurally defaulted. (Dkt. 23 at 18) Miller raised the claim in a petition alleging ineffective assistance of appellate counsel. (Id., Ex. 14a) The appellate court "dismissed" the petition "as successive." (Id., Ex. 14b; see also Fla. R. App. P. 9.141(d)(6)(C) ("The court may dismiss a second or successive petition if it does not allege new grounds and the prior determination was on the merits, or if a failure to assert the grounds was an abuse of procedure."))

---

[9] It appears that counsel misspoke when he made this statement. His primary argument in closing was that "there's reasonable doubt permeating this courtroom." (Dkt. 25-2, Ex. 1a, at 669)

This was "an independent and adequate state procedural basis" for disposing of the claim. Harris v. Sec'y, Dep't of Corr., No. 8:16-cv-3199-MSS-CPT, 2021 WL 5331202, at *15 (M.D. Fla. Nov. 16, 2021). Indeed, "Florida courts regularly follow the firmly established rule that a petitioner is not entitled to file second or successive petitions alleging ineffective assistance of appellate counsel." Id. Therefore, Miller's claim of ineffective assistance of appellate counsel is procedurally defaulted.

To overcome the default, Miller must show either cause and prejudice or a miscarriage of justice. See Mincey v. Head, 206 F.3d 1106, 1135 (11th Cir. 2000) ("It is well-settled that federal habeas courts may not consider claims that have been defaulted in state court pursuant to an adequate and independent state procedural rule, unless the petitioner can show 'cause' for the default and resulting 'prejudice,' or 'a fundamental miscarriage of justice.'"). Miller seeks to excuse the default under the equitable exception recognized in Martinez v. Ryan, 566 U.S. 1 (2012). (Dkt. 30 at 15-16) Martinez held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 566 U.S. 1, 17 (emphasis added). But Martinez does not apply to claims of "ineffective assistance of appellate counsel." Davila v. Davis, 582 U.S. 521, 525 (2017) ("The question in this case is whether we should extend [the Martinez] exception to allow federal courts to consider a different kind of defaulted claim— ineffective assistance of appellate counsel. We decline to do so."). Accordingly, Miller's claim of ineffective assistance of appellate counsel is barred from review.

### J.    Ground Eight—Issuance of *Per Curiam* Affirmances

Lastly, Miller argues that the appellate court violated his constitutional rights by issuing *per curiam* affirmances—that is, unpublished orders that lacked reasoned analysis and contained only the word "Affirmed." (Dkt. 16 at 19) According to Miller, these unexplained affirmances denied him "due process" by "prevent[ing] review from" the Florida Supreme Court.[10] (Id.) Miller also alleges that the appellate court issues *per curiam* affirmances "ritualistically and capriciously" "without reviewing the merits of the appeal." (Id.)

This claim is meritless. First, "[t]here is no requirement in law that [an] appellate court's decision be accompanied by a written opinion." Furman v. United States, 720 F.2d 263, 264 (2d Cir. 1983); see also King v. Champion, 55 F.3d 522, 526 (10th Cir. 1995) ("[T]here is nothing inherently objectionable in the Oklahoma court's use of summary opinions in unpublished cases."); Landor v. Cain, No. 13-cv-5515, 2014 WL 7342361, at *25 (E.D. La. Dec. 23, 2014) ("[F]ederal law does not require reasoned or written judicial opinions."). Indeed, "[t]he fact that a disposition is by informal summary order rather than by formal published opinion in no way indicates that less than adequate consideration has been given to the claims raised in the

---

[10] "[T]he Supreme Court of Florida lacks jurisdiction to review *per curiam* decisions of the several district courts of appeal . . . rendered without opinion." Jackson v. State, 926 So. 2d 1262, 1265 (Fla. 2006).

appeal." <u>Furman</u>, 720 F.2d at 265. Second, Miller "has no constitutional right to further discretionary review by a supreme court where the conviction has been reviewed on appeal by some intermediate court of appeals." <u>Crump v. Zimmerman</u>, No. 89-cv-3203, 1990 WL 26691, at *3 (E.D. Pa. Mar. 8, 1990).

## IV. CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Miller's amended petition for writ of habeas corpus, (Dkt. 16), is **DENIED**.

2. Respondent's request to dismiss the Attorney General from this action, (Dkt. 23 at 2), is **GRANTED**.[11]

3. The Clerk is **DIRECTED** to enter judgment against Miller and to **CLOSE** this case.

4. Because Miller neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 478 (2000).

**DONE** and **ORDERED** in Tampa, Florida, this 1st day of December 2025.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

---

[11] The proper respondent in a § 2254 action is "the chief officer in charge of the state penal institution," not the Attorney General. <u>Gross v. Sec'y, Dep't of Corr.</u>, No. 2:10-cv-256-JES-DNF, 2013 WL 2477086, at *9 n.1 (M.D. Fla. June 10, 2013).